Leslie WHALEY, Petitioner,

v.

S. Frank THOMPSON, Respondent.

No. Civ. 97–254–MA.

United States District Court,
D. Oregon.

Sept. 30, 1998.

Steven T. Wax, Federal Public Defender, Portland, OR, for Petitioner.

Hardy Myers, Attorney General, Lynn David Larsen, Jan Peter Londahl, Assistant Attorneys General, Department of Justice, Salem, OR, for Respondent.

## JUDGMENT

MARSH, District Judge.

Based on the Record,

IT IS ORDERED AND ADJUDGED that petitioner's habeas corpus petition (# 1) is GRANTED IN PART and DENIED IN

PART as follows: Petitioner's first-degree kidnaping conviction in Multnomah County Circuit Case No. C88–07–35193 is VACATED and the petition is DENIED as to the remaining issues.

## ORDER

In accordance with my opinion issued this date, the petition for writ of habeas corpus (# 1) is GRANTED in part and DENIED in part as follows: GRANTED as to petitioner's kidnaping conviction and DENIED as to petitioner's rape conviction. Petitioner's first degree kidnaping conviction is VACATED.

IT IS FURTHER ORDERED that petitioner's motion for summary judgment (# 8) is DENIED and respondent's motion to deny habeas corpus relief (# 19) is DENIED as to the conviction for first degree kidnaping and GRANTED as to the remaining issues.

Petitioner's counsel shall present a form of judgment.

IT IS SO ORDERED.

## OPINION

Petitioner, an inmate at the Oregon State Penitentiary, brings this petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. Currently before the court are the petition (# 1), the petitioner's motion for summary judgment (# 8), and the respondent's motion to deny habeas corpus relief (# 19). For the reasons set forth below, the petitioner's motion for summary judgment (# 8) is DENIED. The petition (# 1), as well as the motion to deny habeas corpus relief (# 19) are each GRANTED IN PART and DENIED IN PART.

## *PROCEDURAL BACKGROUND*

Petitioner was convicted on December 12, 1988, on charges of first degree rape and first degree kidnaping. On March 3, 1989, he was sentenced to a 20–year term of imprisonment on the rape charge and a consecutive 10–year term of imprisonment on the kidnaping charge.

Petitioner directly appealed his conviction and sentence. Petitioner's court-appointed attorney filed a brief on behalf of petitioner

and petitioner also submitted a *pro se* brief asserting additional assignments of error. The Oregon Court of Appeals affirmed without opinion, the Oregon Supreme Court denied review, and the United States Supreme Court denied *certiorari*. *State v. Whaley*, 108 Or.App. 365, 815 P.2d 722, *rev. denied*, 312 Or. 526, 822 P.2d 1195 (1991), *cert. denied*, 504 U.S. 977, 112 S.Ct. 2951, 119 L.Ed.2d 574 (1992).

Petitioner subsequently filed a petition for state post-conviction relief. Again, despite being represented by counsel, petitioner filed his own supplemental briefs and exhibits. The matter was submitted on the briefs and exhibits without any testimony or argument. On December 13, 1993, the court issued its findings of fact and conclusions of law denying the petition.

Petitioner appealed the denial of post-conviction relief. His court-appointed counsel submitted a *"Balfour"* brief, in which he indicated that the appeal was frivolous, and attached arguments that petitioner desired to make. *See State v. Balfour*, 311 Or. 434, 814 P.2d 1069 (1991). The Oregon Court of Appeals affirmed the decision below, without opinion, and the Oregon Supreme Court denied review. *Whaley v. Maass*, 138 Or.App. 304, 906 P.2d 871 (1995), *rev. denied*, 323 Or. 264, 916 P.2d 312 (1996). The instant petition was filed on February 13, 1997. In it, petitioner raises six separate grounds for relief.

## *DISCUSSION*

### I. *SUMMARY OF FACTS.*

Deborah Baker, the victim, first met petitioner at the Pass Club, an alcohol-free nightclub, on May 6, 1988. The following evening, Baker went to the Pass Club again. As Baker was leaving the Pass Club around midnight, petitioner called Baker's name and asked if she would go for coffee with him. She agreed. Around 1:30 am, they went to a coffee shop near Baker's home. In the course of their conversation, Baker told petitioner she was leaving for Minnesota in a few days to enter a substance abuse program. Petitioner told Baker he wanted to stay in touch with her and wrote his name, address,

and phone number on a piece of paper he cut out of a placemat using a pocket knife. After using the knife, petitioner put it into his coat pocket.

Around 3:00 a.m., Baker asked petitioner to take her home. Petitioner drove Baker to her parents' house. They parked either directly in front of the house or next door, and sat in the car talking. When Baker told petitioner she had to go and reached to open the door, petitioner pulled her into the car and told her she could not go. Baker and petitioner kissed. Then, according to Baker, petitioner forced himself on her. In response, she said "don't" several times. Baker tried to push petitioner off, but finally submitted.

Petitioner never struck Baker, threatened her or displayed any weapon. She sustained no cuts, bruises, or marks. Nevertheless, Baker testified that she knew petitioner had the pocket knife in his jacket and that she was terrified by it. She remembered attending a class where she had been taught "that if there was any possibility that you could be in danger or that there was not a chance that you could get away to submit." She did not scream for help because she did not think anyone would hear her.

Baker testified that after forcing himself upon her, petitioner immediately drove off preventing her escape from the car. They drove to an apartment building which petitioner identified as "a friend's house." According to Baker, petitioner got out, rapped on an apartment window, and returned to the car when there was no response. Baker did not think she had an opportunity to escape at that time because petitioner "kept an eye on her." During the entire time they were driving around petitioner never displayed any weapon, physically restrained her, or threatened to harm her. The car doors were unlocked. Baker testified that she didn't get out and run when they stopped at red lights or at the apartment building because she feared petitioner might chase after her.

Petitioner then drove Baker back to the Pass Club. There were "construction people and staff members" present. Petitioner went to use the restroom. When he returned, Baker says she told him that what he had done was wrong, and threatened to call the police if he didn't leave. She took a cab home and told her parents that she had been raped. Baker's parents immediately called the police.

Petitioner, when interviewed by the police, stated that he thought Baker had accused him as part of a plot by Darleen Emmonds, whom petitioner's referred to as his "ex-wife." In the weeks prior to trial, petitioner wrote several letters, to Emmonds and others, outlining his perception of the plot. At trial, he offered testimony that the entire story given by Baker was a fraud, a fabrication and a conspiracy to get him into trouble and to extort money from him or to obtain state funds for an abortion under false pretenses.

At trial, petitioner was represented by court-appointed counsel. After the prosecutor's opening argument, however, petitioner abruptly announced that he wanted to question some witnesses himself because he knew more about the details of the case than did his attorney, Robert Swider, and he wanted his accusers to have to "look [him] in the eye." However, petitioner still wanted Swider to handle "about 95 percent of [the] case." The trial judge tried to discourage petitioner from representing himself but ultimately allowed petitioner to proceed *pro se.* However, in view of petitioner's expressed intent to have Swider still handle "95 percent" of the case, and reservations about petitioner's ability to represent himself, the trial judge agreed to permit a "hybrid" representation. Petitioner would be in charge of his own defense, but he could delegate specific tasks to Swider. Swider protested that his client wasn't competent to stand trial, let alone represent himself, but that objection was overruled. Swider subsequently proposed that he be the one to make all evidentiary objections. Petitioner and the trial judge both agreed to this division of responsibility.

## II. *STANDARDS.*

Before considering the merits of the petition, I must first determine the impact of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub.L. 104–132,

which amended 28 U.S.C. § 2254 in several respects. The parties disagree on the proper interpretation of the Act and whether it applies to petitioner's habeas petition, in five respects: (1) the viability of the prior petition precluding application of the AEDPA; (2) the impermissible retroactive effect of the AEDPA; (3) the continued discretion to hold evidentiary hearings in this court; (4) the continued recognition of procedural default as a defense; and (5) the deference to be accorded state court decisions.

### A. *Continuation of Earlier Petition.*

■ Initially, I reject petitioner's contention that the AEDPA is inapplicable to this case because the instant petition is merely a "continuation" of an earlier petition that petitioner filed on March 18, 1992. The first petition was dismissed, without prejudice, because petitioner had not exhausted his state remedies. Although the prior petition does not count for purposes of the rule barring successive § 2254 petitions, *In re Turner*, 101 F.3d 1323 (9th Cir.1996), that does not mean the present petition relates back to the one filed five years earlier. In short, the instant petition was not "already pending" when the AEDPA was passed.

### B. *"Impermissible Retroactive Effect."*

■ Because this action was filed after April 26, 1996, the provisions of the AEDPA apply. *See Lindh v. Murphy*, 521 U.S. 320, 117 S.Ct. 2059, 2061–68, 138 L.Ed.2d 481 (1997); *Calderon v. U.S. Dist. Court*, 128 F.3d 1283, 1287 (9th Cir.1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 899, 139 L.Ed.2d 884 (1998). Nevertheless, petitioner contends that the AEDPA—if interpreted in the manner respondent urges—would have an "impermissible retroactive effect" because it would "attach[ ] new legal consequences to the 1993 state court post-conviction proceedings." The AEDPA contains a number of provisions, and the effect of each differs. Accordingly, it is not possible to make a blanket statement that the AEDPA does, or does not, have an impermissible retroactive effect. Rather, each provision must be analyzed separately in the context of a given case.

■ First, petitioner argues that had he known that the rules, procedures, and standards for resolution of habeas corpus claims in federal court would change as radically as the state suggests, he would not have agreed to voluntarily dismiss his 1992 federal habeas petition. That argument fails because dismissal was mandatory due to petitioner's failure to exhaust his state court remedies.

■ Next, petitioner contends that to deny him a federal court evidentiary hearing would attach new legal significance to the state court post-conviction proceeding. Petitioner appears to be arguing that because he knew that he was entitled to a federal court evidentiary hearing, he did not present all of his evidence and arguments in the state post-conviction proceeding.

State post-conviction proceedings are not a mere formality in preparation for proceedings in federal court. Petitioner was required to present all of his evidence and his best arguments to the state court. This rule predates the 1993 post-conviction proceeding. *See Keeney v. Tamayo–Reyes*, 504 U.S. 1, 112 S.Ct. 1715, 118 L.Ed.2d 318 (1992). Consequently, the AEDPA's limitation upon federal court evidentiary hearings does not have an impermissible retroactive effect in this instance.

■ The court also finds no merit to petitioner's contention that the AEDPA has an impermissibly retroactive effect if it increases the level of deference given to the state court's findings of fact and conclusions of law. Petitioner had every incentive to fully litigate in state court. There is no reason to believe that he would have done anything differently had he known the state court's decision would be entitled to greater deference. There is nothing fundamentally unfair about applying the AEDPA to this petition.

### C. *Discretion to Hold an Evidentiary Hearing.*

■ 28 U.S.C. § 2254(e)(2) restricts the availability of evidentiary hearings in federal habeas corpus proceedings as follows:

(2) If the applicant has failed to develop the factual basis of a claim in State court

proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that—

(A) the claim relies on—

(i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

(ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and

(B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

Despite the mandatory language of the statute, the circuits to address the application of § 2254(e)(2) have uniformly held that if the applicant/petitioner diligently sought to develop the factual basis of a claim for habeas relief but was denied the opportunity to do so *by the state court*, § 2254(e)(2) is inapplicable and the federal court retains discretion to hold an evidentiary hearing. *Jones v. Wood*, 114 F.3d 1002, 1013 (9th Cir.1997); *Cardwell v. Greene*, 152 F.3d 331, 1998 WL 466704, *6 (4th Cir.1998); *McDonald v. Johnson*, 139 F.3d 1056, 1059–60 (5th Cir. 1998); *Burris v. Parke*, 116 F.3d 256, 258–59 (7th Cir.), *cert. denied*, —— U.S. ——, 118 S.Ct. 462, 139 L.Ed.2d 395 (1997); *Love v. Morton*, 112 F.3d 131, 136 (3rd Cir.1997). I find the reasoning in the above cases persuasive.

■ In the instant proceeding, however, petitioner argues that the failure of his post-conviction counsel to develop certain facts at the state post-conviction proceeding should not be attributed to petitioner and is not a basis for denying an evidentiary hearing. This court cannot agree. Post-conviction counsel "is the petitioner's agent when acting, or failing to act, in furtherance of the litigation." *Coleman v. Thompson*, 501 U.S. 722, 753, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). Because ineffective assistance of post-conviction counsel does not rise to the level of a Sixth Amendment violation, counsel's errors are not imputed to the state (*see*

*Id.* at 754, 111 S.Ct. 2546) and are not a basis for avoiding the restrictions of § 2254(e)(2).

■ Finally, I reject petitioner's contention that § 2254(e)(2) is an unconstitutional restriction of this court's jurisdiction. *Cf. Coleman*, 501 U.S. at 750, 111 S.Ct. 2546 ("[n]o procedural principle is more familiar ... than that a constitutional right may be forfeited ... by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it") (quoting *Yakus v. United States*, 321 U.S. 414, 444, 64 S.Ct. 660, 88 L.Ed. 834 (1944)).

### D. *Procedural Default.*

■ Petitioner contends that by passing the AEDPA, Congress abolished "procedural default" as a defense to a habeas corpus proceeding brought under § 2254. He argues that because Congress included the defense in one section of the statute, i.e., the provisions pertaining only to capital cases, but omitted it in another section, i.e., § 2254, Congress intended to abolish the defense in the section from which it was omitted. This court concludes that procedural default, as an extension of the concept of exhaustion of remedies, remains a viable defense to a habeas corpus action under § 2254(b)(1). *See Truesdale v. Moore*, 142 F.3d 749, 753 n. 2 (4th Cir.), petition for cert. filed (Aug. 20, 1998) (rejecting "novel" suggestion that AEDPA somehow abolished procedural default in non-capital cases); *Moleterno v. Nelson*, 114 F.3d 629, 633–34 (7th Cir.1997) (same). Having concluded that procedural default is viable under the AEDPA, it is necessary to examine its applicability to this case.

■ A state prisoner must exhaust all available state court remedies either on direct appeal or through collateral proceedings before a federal court may consider granting habeas corpus relief. *Keeney*, 504 U.S. at 9, 112 S.Ct. 1715; *Duckworth v. Serrano*, 454 U.S. 1, 3, 102 S.Ct. 18, 70 L.Ed.2d 1 (1981). A prisoner satisfies the exhaustion requirement by "fairly" presenting his claims to the highest state court with jurisdiction to consider them. *Keeney*, 504 U.S. at 9, 112 S.Ct. 1715; *Picard v. Connor*, 404 U.S. 270, 276, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971). A prisoner

fairly presents his claims by describing in the state court proceeding both the operative facts and the legal theory on which his claim is based. *Anderson v. Harless,* 459 U.S. 4, 6, 103 S.Ct. 276, 74 L.Ed.2d 3 (1982); *Guizar v. Estelle,* 843 F.2d 371, 372 (9th Cir.1988).

■ If it is clear that no state remedies remain available to the petitioner, the exhaustion requirement is satisfied. *See Coleman,* 501 U.S. at 732, 111 S.Ct. 2546; *see also Kellotat v. Cupp,* 719 F.2d 1027, 1029 (9th Cir.1983). On the other hand, if the petitioner has procedurally defaulted on a claim in state court, then habeas corpus relief must be denied. If a habeas petitioner could have previously raised his federal claim in state court but failed to do so and is now barred from doing so by a state procedural rule, he has procedurally defaulted on that claim. *Murray v. Carrier,* 477 U.S. 478, 485, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986); *Tacho v. Martinez,* 862 F.2d 1376, 1378 (9th Cir. 1988).

■ If a petitioner has procedurally defaulted on a claim in state court, federal habeas review is barred unless the prisoner can demonstrate cause for the procedural default and actual prejudice or demonstrate that the failure to consider the claims will result in a fundamental miscarriage of justice. *Sawyer v. Whitley,* 505 U.S. 333, 337, 112 S.Ct. 2514, 120 L.Ed.2d 269 (1992); *Noltie v. Peterson,* 9 F.3d 802, 804–05 (9th Cir .1993). Cause "must be something external to the petitioner, something that cannot be fairly attributed to him." *Coleman,* 501 U.S. at 753, 111 S.Ct. 2546. Prejudice is actual harm resulting from the alleged constitutional violation. *Thomas v. Lewis,* 945 F.2d 1119, 1123 (9th Cir.1991). In the extraordinary case, "[a] 'fundamental miscarriage of justice' occurs when 'a constitutional violation has probably resulted in the conviction of one who is actually innocent.'" *Boyd v. Thompson,* 147 F.3d 1124, 1127 (9th Cir.1998) (quoting *Murray,* 477 U.S. at 495–496, 106 S.Ct. 2639).

■ In the present action, a threshold question is whether the claims presented to the state court—and which therefore were not procedurally defaulted—include only the claims presented by petitioner's court-appointed attorney(s), or also include the claims that petitioner himself presented to the state courts. Without deciding the propriety of such "supplemental" claims asserted by a represented petitioner, this court will consider both to the extent they were considered by the state courts.[1] Petitioner properly insisted upon preserving his record by raising all of his issues, notwithstanding his attorney's contrary advice and threat to withdraw if petitioner did not follow his advice. *Cf. Clemmons v. Delo,* 124 F.3d 944, 948–49 (8th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1548, 140 L.Ed.2d 695 (1998).

**E. *Deference to State Court Decisions.***

The AEDPA revised the standards of deference a district court must accord state court decisions in habeas corpus proceedings. The new standards are set forth in § 2254(d), which provides:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. (Emphasis added.)

■ The Ninth Circuit has opined that the "contrary to" standard of review set forth in § 2254(d)(1) governs pure questions of law and the "unreasonable application" standard of review governs mixed questions of law and fact. *Moore v. Calderon,* 108 F.3d 261, 265

---

1. In the state post-conviction proceeding, the court sustained the state's objection to one supplemental brief which petitioner filed *pro se.*

n. 3 (9th Cir.), *cert. denied*, —— U.S. ——, 117 S.Ct. 2497, 138 L.Ed.2d 1003 (1997) (citing with approval *Drinkard v. Johnson*, 97 F.3d 751, 767 (5th Cir.1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 1114, 137 L.Ed.2d 315 (1997) and *Lindh v. Murphy*, 96 F.3d 856, 870 (7th Cir.1996), *rev'd. on other grds*, 521 U.S. 320, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997)); *see also Neelley v. Nagle*, 138 F.3d 917, 923–24 (11th Cir.1998); *but see O'Brien v. .Dubois*, 145 F.3d 16 (1st Cir.1998); *Green v. French*, 143 F.3d 865, 870–72 (4th Cir. 1998) ("contrary to" standard applies if Supreme Court precedent compels result and, if not, "unreasonable application" standard governs). The determination of a question of fact is reviewed for reasonableness under § 2254(d)(2), as limited by the presumption of correctness set forth in § 2254(e)(1).

■■■■ Accordingly, I conclude that "[s]tate court conclusions of law ... should be examined *de novo.*" *Jeffries v. Wood*, 114 F.3d 1484, 1500 (9th Cir.1997) (en banc), *cert. denied*, —— U.S. ——, 118 S.Ct. 586, 139 L.Ed.2d 423 (1997).[2] A state court decision resolving a "mixed question of law and fact," in contrast, must be given deference unless "it is 'so clearly incorrect that it would not be debatable among reasonable jurists.' " *Jeffries*, 114 F.3d at 1500 (quoting *Drinkard*, 97 F.3d at 769); *Neelley*, 138 F.3d at 924.[3] I am not convinced that the foregoing construction of the statute renders it unconstitutional. *See Corwin v. Johnson*, 150 F.3d 467, 471–72 (5th Cir.1998) (no violation of Supremacy Clause); *Lindh*, 96 F.3d at 867–68, 871–74 (no violation of Suspension Clause, Supremacy Clause, Due Process Clause or Article III); *see also Wright v. West*, 505 U.S. 277, 287–95, 112 S.Ct. 2482, 120 L.Ed.2d 225 (1992) (summarizing uncertainty in Supreme Court cases as to whether deferential standard of review appropriate to state court determinations of mixed questions of law and

fact without reference to any constitutional infirmity in such approach).

■■■■ Before the deferential § 2254(d)(1) standard of review is applied, of course, the court must determine whether petitioner's claim was "adjudicated on the merits in State court proceedings." *See Jackson v. Johnson*, 150 F.3d 520, 523 (5th Cir.1998). Here, petitioner's conviction was affirmed on direct appeal, after full briefing by the parties, albeit without a written opinion. While a written opinion addressing petitioner's claims would have been instructive as to the bases for denying those claims, the lack of such an opinion does not mean petitioner's claims were not adjudicated on the merits. *See Cardwell*, 152 F.3d 331, 338.

■■■■ Similarly, although the state postconviction court's decision was based upon the record, as supplemented by affidavits, without any additional testimony, the court considered the evidence and made explicit findings of fact and conclusions of law. As such, I find that the claims presented therein were "adjudicated on the merits in State court proceedings" such that the standards of § 2254(d)(1) apply. *See Id.* at 523–24.

### III. *ANALYSIS OF PETITIONER'S GROUNDS FOR RELIEF.*

#### A. *Ground One: Ineffective Assistance of Counsel.*

■■■■ A defendant alleging the ineffective assistance of counsel must show (1) that counsel's performance was deficient, and (2) that this prejudiced his defense, i.e, that counsel's errors were so serious as to deprive the defendant of a fair trial, that is, a trial whose result is reliable. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). For errors that were committed during the guilt phase, "the question is whether there is a reasonable proba-

**2.** The determination of what is "clearly established Federal law, as determined by the Supreme Court of the United States" under § 2254(d)(1) is also a question of law subject to *de novo* review. *Canales v. Roe*, 151 F.3d 1226, 1998 WL 472495 *1 (9th Cir. Aug.14, 1998).

**3.** I note that this is not the first time this court has applied § 2254(d)(1), as amended by the

AEDPA, and as construed in this opinion. *See Vollmer v. Thompson*, Civ. No. 96–6238–MA (D.Or. Sept. 23, 1997), *aff'd* —— F.3d ——, 1998 WL 667946 (9th Cir. Sept. 15, 1998) (unpublished opinion); *Weaver v. Thompson*, Civ. No. 97–428–JO (D.Or. Jan. 27, 1998), notice of appeal filed (Aug. 12, 1998); *Glenn v. Thompson*, Civ. No. 97–81–JO (D.Or. Aug. 13, 1997).

bility that, absent the errors, the fact finder would have had a reasonable doubt respecting guilt." *Id.* at 695, 104 S.Ct. 2052. A "reasonable probability" is less than a preponderance of the evidence. *See Kyles v. Whitley*, 514 U.S. 419, 434–35, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995); *Strickland*, 466 U.S. at 693, 104 S.Ct. 2052 ("defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case.") The question is not whether the defendant would more likely than not have received a different verdict but whether he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. *See Kyles*, 514 U.S. at 434, 115 S.Ct. 1555.

▮ There is a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance, or what "might be considered sound trial strategy." *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052. Reasonableness is judged as of the time of counsel's conduct, not in hindsight. *Id.* at 689–90, 104 S.Ct. 2052. The petitioner must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance. *Id.* at 690, 104 S.Ct. 2052.

▮ Whether trial counsel is ineffective involves a mixed question of law and fact. *See Crandell v. Bunnell*, 144 F.3d 1213, 1216 (9th Cir.1998) (applying pre-AEDPA law); *Moran v. Godinez*, 57 F.3d 690, 699 (9th Cir.1994) (same), *cert. denied*, 516 U.S. 976, 116 S.Ct. 479, 133 L.Ed.2d 407 (1995). Thus, under the interpretation of § 2254(d)(1) above, the court may grant a writ of habeas corpus on this basis only if it is determined "that the state court decision rested on 'an unreasonable application of clearly established Federal law, as determined by the Supreme Court,' to the facts of the case." *Drinkard*, 97 F.3d at 768 (quoting § 2254(d)(1)).

#### 1. *Timely Investigation of Case*

▮ Petitioner contends that his lawyer failed to timely investigate his case and contact potential witnesses. Defense counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. *Strickland*, 466 U.S. at 691, 104 S.Ct. 2052. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments. *Id.; Burger v. Kemp*, 483 U.S. 776, 794–95, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987).

▮ An attorney's failure to locate potential witnesses will usually constitute ineffective assistance when, without adequate justification, the attorney refuses or neglects to perform any investigation into leads directly related and of potentially great benefit to the defense. *See Hendricks v. Calderon*, 70 F.3d 1032, 1040 (9th Cir.1995), *cert. denied*, 517 U.S. 1111, 116 S.Ct. 1335, 134 L.Ed.2d 485 (1996). However, defense counsel need not follow every idea suggested by his client. *See United States v. Tucker*, 716 F.2d 576, 584 (9th Cir.1983) ("the duty to investigate and prepare a defense is not limitless: it does not necessarily require that every conceivable witness be interviewed").

The state post-conviction court made a general finding that "[t]rial counsel investigated petitioner's case to the extent possible under the circumstances." The brief post-conviction record and the court's finding provide no analysis or recitation of the legal standard it applied.

▮ The post-conviction court, with the agreement of the state and petitioner's court-appointed attorney (but over petitioner's initial objections), decided the case based on the record and exhibits submitted by the parties.[4] Petitioner's attorney did not proffer

---

4. When petitioner appeared before the post-conviction court for hearing, he objected to his attorney's stated intention to submit the case on the record, and expressed surprise that no exculpato-

ry witnesses had been called to testify on his behalf. After conferring with petitioner during a brief recess, his attorney represented to the court that petitioner agreed to submit the case on the

testimony through the affidavits or the depositions of additional witnesses whose testimony may have been exculpatory, and failed to offer a number of documents potentially relevant to the investigation conducted by petitioner's trial attorney. As a result, this court has an incomplete statement of the likely testimony from one material witness, and no affidavits from any other prospective witnesses. Because petitioner was not precluded from fully developing the factual basis for this claim *by the state court*, however, he is not now entitled to an evidentiary hearing to develop those facts. *See* § 2254(e)(2) and p. 1156 *supra.*

■ The post-conviction record shows that petitioner's trial counsel, Swider, was understandably reluctant to pursue potential "witnesses" who could not possibly offer relevant evidence, and in several instances, would likely have offered damaging testimony as they later did when called as prosecution witnesses. Although many of petitioner's proposed witnesses were properly discounted, it does appear there were several potential witnesses whom Swider should have interviewed but did not. Swider explains his failure to contact these witnesses on grounds that "quite a bit of time had passed between the time of the crime and the time I was appointed to represent Mr. Whaley." However, that time interval was only from May to September, 1988. Nevertheless, because petitioner failed to develop what those witnesses would have said in the state proceedings, petitioner's claim fails. *See* 28 U.S.C. § 2254(e)(2).

■ In sum, although Swider's investigation may have been questionable under the standard of performance expected of a reasonable attorney, the record compiled during the state post-conviction proceeding is inadequate to establish that but for his omissions there was a reasonable probability that the result would have been different. Accordingly, I necessarily find that the state post-conviction court's conclusion that petitioner did not receive ineffective assistance counsel

was not an unreasonable application of clearly established federal law with respect to the alleged failure to investigate.

### 2. *Failure to Obtain or Inspect Medical Records or Physical Evidence.*

■ Petitioner also contends that Swider failed to obtain or inspect certain physical and documentary evidence. Adequate pre-trial preparation, including the examination of documents and the inspection of physical evidence, is essential to properly represent a criminal defendant. *Coleman v. Calderon,* 150 F.3d 1105, 1113 (9th Cir.1998); *United States v. Berkowitz,* 927 F.2d 1376, 1382 (7th Cir.), *cert. denied,* 502 U.S. 845, 112 S.Ct. 141, 116 L.Ed.2d 108 (1991). On the other hand, the question of how much preparation is enough, like the numerous other decisions that an attorney must make in the course of representation, is a matter of professional judgment. *Berkowitz,* 927 F.2d at 1382. Petitioner must show that his counsel's decision was outside the wide range of reasonable professional judgment. *Id.*

Most of petitioner's complaints are groundless. Nevertheless, the limited state court record reveals several potentially important omissions, or what appear to be omissions, by Attorney Swider. Apparently, he failed to inspect such physical evidence as the records from the hospital where Baker was examined following the alleged rape; failed to obtain the rape test kit or any results from that examination; and failed to inspect the clothing that Baker was wearing.

However, to prevail on this claim, petitioner must do more than simply show that his attorney failed to obtain or inspect this evidence. He must also show that but for the omission, there is a reasonable probability that the outcome of the case would have been different. Petitioner has not met that burden. None of those items are in the record. At this point, it is pure speculation that these items would have contradicted rather than supported Baker's testimony. Even if they were belatedly produced now, there is no

record, with the addition of one exhibit prepared by petitioner. The post-conviction judge specifically asked petitioner if he understood and agreed with what his attorney said and if petitioner was satisfied that his attorney could present the exhibits and make the arguments petitioner wanted raised. Petitioner replied with an unequivocal yes.

apparent reason why they could not have been produced during the state post-conviction proceeding. As such, the state post-conviction court's conclusion that petitioner did not receive ineffective assistance of counsel was not an unreasonable application of clearly established federal law with respect to petitioner's claims regarding the inspection of documentary and physical evidence.

### 3. *Sentencing.*

■ Petitioner contends Swider rendered ineffective assistance of counsel at sentencing because he had no incentive to keep petitioner out of prison for fear that petitioner might sue him for malpractice or file a complaint with the Oregon State Bar. This issue was not properly raised at the state court level and therefore is procedurally defaulted. Moreover, petitioner has not shown that Swider's performance at sentencing was deficient. On the contrary, Swider successfully persuaded the trial judge to change his initial conclusion and to omit a finding that petitioner was a "dangerous offender." Petitioner also contends that Swider should have been present during the interview with Dr. Colbach. However, the record indicates that petitioner vacillated on whether he wanted Swider present, and there is no evidence that Swider's absence had any affect upon the sentence that petitioner received.

■ Petitioner also contends that Swider should have contested some of the victim impact information in the presentence report, relating to the alleged pregnancy and medical complications. However, it is unclear what Swider could have done other than to point out some ambiguities or inconsistencies in the medical records and the absence of clear proof that petitioner was responsible for those injuries. Because petitioner did not develop these facts in the state proceedings, this court cannot determine whether this was in fact a tactical choice on Swider's part. Consequently, I conclude that the state post-conviction court's conclusion on this claim was not an unreasonable application of clearly established federal law.

### B. *Ground Two: Proceeding Pro Se.*

Petitioner contends that his decision to represent himself was not voluntary. He argues that he was forced to proceed *pro se* by counsel's lack of preparation for trial. Assuming this argument states a Sixth Amendment claim, *see United States v. Silkwood,* 893 F.2d 245 (10th Cir.1989), *cert. denied,* 496 U.S. 908, 110 S.Ct. 2593, 110 L.Ed.2d 274 (1990), it has no merit here.

■ A criminal defendant has an absolute right to represent himself. *Faretta v. California,* 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). The decision to waive counsel must be knowing, voluntary, and intelligent. *Id.* The "defendant must be aware of the nature of the charges against him, the possible penalties, and the dangers and disadvantages of self-representation." *United States v. Balough,* 820 F.2d 1485, 1487 (9th Cir.1987). A waiver is required even if the court approves a "hybrid representation" in which the defendant functions as a co-counsel. *United States v. Kimmel,* 672 F.2d 720, 721 (9th Cir.1982). A defendant competent to stand trial is also competent to waive his right to counsel and represent himself. *Godinez v. Moran,* 509 U.S. 389, 113 S.Ct. 2680, 125 L.Ed.2d 321 (1993). Whether a waiver of the Sixth Amendment right to counsel was made knowingly, intelligently, and voluntarily is a mixed question of law and fact. *Harding v. Lewis,* 834 F.2d 853, 857 (9th Cir. 1987), *cert. denied* 488 U.S. 871, 109 S.Ct. 182, 102 L.Ed.2d 151 (1988).

■ While the record demonstrates that petitioner had great difficulty in comprehending the relevant issues, the threshold for competency to stand trial is quite low. *Godinez,* 509 U.S. at 396, 113 S.Ct. 2680. The trial judge did not err by allowing petitioner to represent himself. Petitioner was repeatedly warned of the disadvantages of self-representation in about as much detail as was possible under the circumstances. The trial judge offered to delay the trial so petitioner could think about his decision overnight, and let petitioner discuss this decision with his mother and his lawyer. At the conclusion of the trial, the trial judge also made supplemental findings concerning petitioner's competency to represent himself.

Although counsel may have been better prepared, that does not appear to have been petitioner's primary motivation in representing himself. Rather, he told the court that he thought he could do a better job than his lawyer questioning certain witnesses because he knew more about the details of the case and he wanted his accusers to have to "look [him] in the eye." Near the end of the trial petitioner admitted that in representing himself he could testify from counsel table by asking improper questions, which he did throughout the trial, without having to take the stand and risk having his prior criminal record brought out. (Tr. 752.) In sum, there is ample evidence to sustain the trial court's determination that petitioner knowingly and voluntarily waived his Sixth Amendment right to counsel. That decision was not an unreasonable application of clearly established federal law.

### C. Ground Three: Prosecutorial Misconduct.

■■■■ Prosecutorial misconduct is cognizable in federal habeas corpus. The appropriate standard of review is the narrow one of due process and not the broad exercise of supervisory power. *Darden v. Wainwright,* 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986). A defendant's due process rights are violated when a prosecutor's misconduct renders a trial "fundamentally unfair." *Id.*; *Smith v. Phillips,* 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982) ("the touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor"). Generally, a claim of prosecutorial misconduct presents a mixed question of law and fact. *See United States v. McConney,* 728 F.2d 1195, 1204 (9th Cir.), *cert. denied,* 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984); *United States v. Spillone,* 879 F.2d 514, 520 (9th Cir.1989), *cert. denied,* 498 U.S. 878, 111 S.Ct. 210, 112 L.Ed.2d 170 (1990).

Petitioner alleges four specific instances of prosecutorial misconduct which resulted in the denial of due process: (a) the knowing use of or failure to correct perjured testimony by Baker about her medical condition; (b)

withholding exculpatory medical reports which contradicted Baker's testimony regarding her medical condition; (c) withholding information regarding payments to Baker and other victims compensation material and failing to correct testimony by Baker; and (d) failing to produce Baker's underwear for inspection pretrial and then presenting it as trial evidence.

■■■■ Throughout the extensive briefing in support of his petition, petitioner does not limit his argument to these four specific instances. Rather, notwithstanding the lack of an articulated claim on the issue, he appears to "overlay" his arguments with a claim that the prosecutor committed misconduct by introducing testimony which was highly inflammatory, prejudicial, and, at its core, irrelevant. Because the prosecutor's alleged misconduct in this respect was not raised by petitioner as a separate ground for relief, I decline to address the argument in detail. *See Frey v. Schuetzle,* 78 F.3d 359, 360–61 (8th Cir.1996) (district court must adjudicate only those claims upon which habeas petitioner seeks relief, especially when habeas petition was prepared by counsel). In any event, the prosecutor's acts about which petitioner appears to complain did not "so infect[ ] the trial with unfairness as to make the resulting conviction a denial of due process." *Williams v. Borg,* 139 F.3d 737, 744 (9th Cir.), *pet'n for cert. filed,* —— U.S. —— (Aug. 18, 1998) (citing *Darden v. Wainwright,* 477 U.S. at 181, 106 S.Ct. 2464).

### 1. The Knowing Use of or Failure to Correct Perjured Testimony by Baker About Her Medical Condition.

■■■■ It is a fundamental cornerstone of due process that the Constitution "cannot tolerate a . . . criminal conviction obtained by the knowing use of false evidence." *Miller v. Pate,* 386 U.S. 1, 7, 87 S.Ct. 785, 17 L.Ed.2d 690 (1967). The prosecution offends due process when false evidence is used, whether it solicits the evidence or simply allows it "to go uncorrected when it appears." *Napue v. Illinois,* 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959) (citations omitted). Due process is equally offended by direct statements which are untrue and the eliciting of

testimony which "taken as a whole" gives the jury a "false impression." *Alcorta v. Texas,* 355 U.S. 28, 31, 78 S.Ct. 103, 2 L.Ed.2d 9 (1957). When false evidence is used, even unwittingly, a new trial is required "if there is a reasonable probability that [without the evidence] the result of the proceeding would have been different." *United States v. Young,* 17 F.3d 1201, 1204 (9th Cir.1994).

Petitioner contends that he was denied due process of law when the prosecution knowingly elicited false and perjurious testimony from Baker and her mother, did not correct the false and perjurious testimony and referenced the testimony in argument. Petitioner objects to a reference in the prosecutor's opening statement, as well as testimony by both Baker and her mother to the effect that Baker became pregnant, contracted a venereal disease, and underwent surgery in Minnesota three weeks after her contact with petitioner.

Petitioner contends that, contrary to the testimony described above, Baker did not contract pelvic inflammatory disease from petitioner and that it was unclear whether Baker was pregnant at all. He further argues that Baker's operation for a ruptured ovarian cyst resulted from an entirely independent cause and was falsely ascribed to an infection which resulted from contact with petitioner. In support of this argument, petitioner relies on a somewhat confusing reading of medical records from the hospital in Minnesota where Baker was treated.

■ In fact, there were several indications that Baker may have been pregnant, although the medical records were not entirely clear on this issue. At most, it appears that there was an honest question of medical fact as to whether she was indeed pregnant. Under these circumstances, it would hardly be perjurious for her to testify that she was. The evidence of alleged perjury with respect to Baker's testimony about pelvic inflammatory disease and the purpose of her operation is equally unconvincing. Given the information available from the medical records, I cannot find that Baker's testimony was false or perjurious.

In sum, this claim is without merit as the testimony at issue is not false or perjurious,

and even if it could be construed as such, there is not a reasonable probability that without this evidence the result of the proceeding would have been different. Moreover, the state post-conviction court's conclusion that none of petitioner's rights were violated by the prosecutor's actions with respect to this issue is not an unreasonable application of clearly established federal law.

### 2. *Withholding Exculpatory Medical Reports.*

■ Under *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), a prosecutor must disclose only evidence that is both favorable to the accused and material either to guilt or punishment. Thus, under Brady, a prosecutor is not required to deliver his entire file to defense counsel, but only to disclose material evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial. *United States v. Bagley,* 473 U.S. 667, 675, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). "A constitutional error occurs, and the conviction must be reversed, only if the evidence is material in the sense that its suppression undermines confidence in the outcome of the trial." *Id.* at 678, 105 S.Ct. 3375. The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome. *Id.* at 682, 105 S.Ct. 3375.

■ Petitioner contends that the prosecutor violated petitioner's due process rights by withholding medical records from the hospital where Baker was seen on May 8, and by withholding the results of the "rape kit" performed at that hospital. Petitioner initially contended that, based upon trial testimony, the records appeared to be exculpatory and contained no reference to any bruises, cuts, scratches or other trauma. Petitioner also argued that the medical records were likely to contain descriptions of the appearance of Baker's clothing. Pursuant to discovery conducted in this action, petitioner ultimately

obtained the Holiday Park medical records, although it appears that the rape kit was never located or produced.

The medical reports from Holiday Park Hospital for Baker's visit on May 8 indeed contain no reference to any bruises, cuts, scratches, or other trauma. Nor do they contain any description of the appearance of Baker's clothing. At trial, in cross-examining Baker from a "Crime Laboratory Information Form," petitioner elicited the following testimony:

Q. The form I'm referring to says, "bite marks, bruises present, no." Next question says, "photographs taken, no. Forensic gynecologist."—Why is it that under bite marks or bruises present, it says no. Can you explain why there's no marks of violence?

A. It's probably because I had no bruises on me.

Q. And then it says, "photographs taken." That says no, that means there was no bruises, scratches and your clothing wasn't torn or disarrayed?

A. No, that's not what it means.

Q. Well, there was not any photographs taken.

A. There were no photographs taken, but that doesn't mean that my clothes weren't torn. (Tr. 364.)

Thus, the information contained in the medical records would have been cumulative on this point. Beyond the issue of the lack of reference to any bruises, cuts, scratches or other trauma, or the condition of Baker's clothing, nothing else contained in the medical reports could be construed as material either. As such, I cannot find that a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. *See Brown v. Crouse*, 425 F.2d 305 (10th Cir. 1970) (doctors' examinations of victim which revealed no medical evidence of alleged attack were not dispositive of veracity of her charge where, *inter alia*, victim testified that assailant told her that he used a protective device). Again, the state post-conviction court's conclusion on this issue is not an unreasonable application of clearly established federal law.

### 3. *Withholding Victim's Compensation Information.*

Petitioner contends that his due process rights were violated when the prosecutor failed to disclose a Victim's Assistance Program application completed by Baker and permitted incorrect testimony by Baker to go uncorrected. He argues that the forms, which reveal Baker's claims for money as a result of the operation which she underwent in Minnesota at the end of May, were critical in several respects. First, the forms would have substantiated petitioner's claim that Baker had a financial motive to lie about their encounter. Second, petitioner would have been able to use the form to establish that Baker lied in her efforts to obtain money by falsely asserting that her operation was needed as a result of the encounter with petitioner rather than as a result of the ruptured ovarian cyst. These claims are without merit.

■■■ The withholding of impeachment material by a prosecutor violates due process. *Bagley*, 473 U.S. at 675, 105 S.Ct. 3375; *United States v. Steinberg*, 99 F.3d 1486, 1491–92 (9th Cir.1996). The withholding of such evidence violates due process even where the defendant has not specifically requested the documents in question. *Paradis v. Arave*, 130 F.3d 385, 392 (9th Cir. 1997). The problem with petitioner's claim is that the forms would not have been effective for the purpose of impeachment. Petitioner's first argument might have had some merit, had Baker waited until *after* she incurred medical expenses to report the alleged rape. She did not. To prevail on an argument that Baker had a financial motivation to lie about her encounter with petitioner would require an incredible stretch of the imagination to conclude that she anticipated medical costs and that she knew victims assistance funds might be available to defray those expenses *on the night of the encounter, when she first reported that she was raped.* As such, I cannot find that evidence Baker applied for victim's assistance compensation was material to an impeachment argument,

such that had the evidence been disclosed there was a reasonable probability that the result of the proceeding would have been different.

Petitioner's second argument is equally unavailing. As discussed above, I cannot find that Baker's testimony about the need for and purpose of her operation was false or perjurious. For the same reasons, I cannot find that the information she supplied on the victims assistance application was a "direct lie" as argued by petitioner. In fact, the application contains virtually identical information to Baker's testimony. Because the information contained in the victim's compensation material would not have been of any value for impeachment purposes, the failure of the prosecutor to produce that information prior to trial did not result in a violation of petitioner's due process rights. Again, the state court decision on this issue was not an unreasonable application of clearly established federal law.

### 4. *Failure to Produce Underwear For Inspection.*

 Petitioner contends that his due process rights were violated because the prosecutor failed to produce Baker's underwear for inspection before trial and then presented the underwear as trial evidence. Contrary to petitioner's position, however, even the most liberal reading of petitioner's direct appeal and state post-conviction record does not demonstrate that petitioner properly exhausted this claim.

At trial, petitioner did object to the admission of Baker's underwear into evidence:

PROSECUTOR: I'd move to introduce State's 8 [the underwear]

THE COURT: Show it to Mr. Whaley. Any objection?

WHALEY: I'd object. My objection is there is no way to know when this particular garment—when the garment was ripped.

THE COURT: I'll overrule the objection. It will be received in evidence, State's Exhibit 8. (Tr. 448.)

This objection, however, did not speak to the failure of the prosecutor to produce the un-

derwear for inspection before trial. At most, it can be construed as an objection based upon the prosecutor's failure to establish a chain of custody.

Petitioner did not raise the issue at all upon his direct appeal. Moreover, in his state post-conviction petition, although petitioner made numerous vague references to prosecutorial misconduct in the context of alleged *Brady* violations, he did not specifically address the underwear. He also did not address the alleged impropriety of the presentation of the evidence at trial (correctly so, as improper admission of the evidence should have been raised on direct appeal). As such, petitioner has procedurally defaulted this issue. He has not shown cause and prejudice excusing this default. Accordingly, he is not entitled to relief.

### D. *Ground Four: Use Of Darleen Emmonds Testimony by Prosecution.*

Petitioner contends that his due process rights were violated by the use of Darleen Emmonds as a witness because of the prejudice resulting from her highly inflammatory testimony and the late notice given of her potential testimony. Specifically, he contends that his due process rights were violated when Emmonds, who was called by the state in its case-in-chief, presented testimony which "turned out to be a highly distasteful character assassination of [petitioner]." Petitioner complains that Emmonds was allowed to testify about (1) the contents of a letter sent by petitioner to her prior to trial; (2) a letter petitioner had written to another person (Ron Bishop) in which he referred to a variety of things he contended Emmonds had done to get him in trouble over the last eight years, and (3) a letter petitioner had written to his daughter. The letters were replete with references to prior bad acts by petitioner, as well as other potentially inflammatory statements.

 Contrary to petitioner's protestations, it appears that he procedurally defaulted this claim. Petitioner did not object to Emmonds' testimony at trial. He did not object to admission of the letter he wrote Emmonds. In fact, petitioner himself read substantial portions of the letter into evi-

dence during his cross examination of Emmonds. While he did object to portions of the Bishop letter when the state attempted to introduce it on Emmonds' direct examination, petitioner himself later offered the letter into evidence.[5] Having failed to object to the evidence of which he now complains, petitioner did not properly preserve this issue for appeal or review.

Petitioner's problems do not end at the trial level. Again, even the most liberal construction of petitioner's direct appeal does not evidence a claim that he fairly presented this issue. At most, the appeal can be construed as asserting a claim that as a matter of state law he was denied notice that Emmonds would testify. Thus, petitioner did not fairly present a federal due process claim for relief to the state's highest court.

Finally, any attempt to raise the issue on state post-conviction is irrelevant, as it was not a legitimate ground for post-conviction relief. *See* O.R.S. 138.550(2) (no ground for relief may be asserted on post-conviction which could reasonably have been asserted on direct appeal). Accordingly, petitioner procedurally defaulted his due process claim based on the alleged "surprise" and the inflammatory nature of Emmonds' testimony. Because he has not shown cause and prejudice excusing this default, he is not entitled to relief on this ground.

### E. *Ground Five: Error In Jury Instructions.*

The court is satisfied that the alleged errors in the jury instructions were harmless and did not affect the outcome of this case. The post-conviction relief court's findings and conclusions on this issue were not contrary to or an unreasonable application of clearly established federal law. Accordingly, relief on this ground is not warranted.

### F. *Ground Six: Insufficient Evidence.*

■ Petitioner contends that there was insufficient evidence to support his convictions for kidnaping and rape. A federal habeas court may review a claim that the

evidence adduced at a state trial was not sufficient to convict a criminal defendant beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 316, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). The relevant question is not whether the reviewing court would have found the defendant guilty beyond a reasonable doubt but "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319–20, 99 S.Ct. 2781. Alleged insufficiency of the evidence to support a conviction presents a mixed question of law and fact. *See Mitchell v. Prunty,* 107 F.3d 1337, 1340 n. 3 (9th Cir.) (applying "unreasonable application" standard to insufficient evidence claim), *cert. denied,* —— U.S. ——, 118 S.Ct. 295, 139 L.Ed.2d 227 (1997), *overruled in part on other grds. Santamaria v. Horsley,* 133 F.3d 1242 (9th Cir.1998) (en banc), petition for cert. filed (May 29, 1998).

#### 1. *Rape Charge.*

■ While the state's case may not have been beyond any doubt, a rational trier of fact could have found that the state proved all essential elements of the rape charge beyond a reasonable doubt, assuming the trier of fact believed Baker's testimony, gave the prosecution the benefit of all reasonable inferences, and discounted all conflicting evidence as it was entitled to do.

Accordingly, I cannot find that the trial court's denial of petitioner's motion for acquittal and the denial of this claim upon his direct appeal resulted from an unreasonable application of clearly established federal law.

#### 2. *Kidnaping Charge.*

■ Under Oregon law, there are two degrees of kidnaping. The basic offense, a Class B felony, is kidnaping in the second degree which is defined in O.R.S. 163.225:

(1) A person commits the crime of kidnaping in the second degree if, with intent to interfere substantially with another's per-

---

**5.** Petitioner did object to portions of the letter he wrote to his daughter, and the trial court sustained those objections.

sonal liberty, and without consent or legal authority, he:

(a) Takes the person from one place to another; or

(b) Secretly confines the person in a place where he is not likely to be found.

However, petitioner was convicted of the more serious Class A felony of kidnaping in the first degree, which is reserved for particularly aggravated offenses:

(1) A person commits the crime of kidnaping in the first degree if he violates O.R.S. 163.225 with any of the following purposes:

(a) To compel any person to pay or deliver money or property as ransom; or

(b) To hold the victim as a shield or hostage; or

(c) To cause physical injury to the victim; or

(d) To terrorize the victim or another person. O.R.S. 163.235.

Thus, petitioner could not be convicted of kidnaping in the first degree unless the prosecution proved all the elements of second degree kidnaping and, in addition, proved beyond a reasonable doubt that the kidnaping was undertaken for one of the specific purposes alleged in O.R.S. 163.235(1).

■ The indictment alleges that petitioner committed the offense "with the purpose of causing physical injury to and terrorizing" the victim, and the case was tried on that basis. Consequently, the court must confine its inquiry to those aggravating factors, *State v. Nulph*, 31 Or.App. 1155, 1164 n. 2, 572 P.2d 642 (1977), *rev. denied*, 282 Or. 189 (1978), and in any event none of the other listed purposes would apply to these facts.[6]

■ There is insufficient evidence in the record from which a rational trier of fact could find, beyond a reasonable doubt, that petitioner drove Baker to the apartment building and the Pass Club for the purpose of causing physical injury to her. During closing argument, the prosecutor told the jury:

There can't be much doubt about what Mr. Whaley's intentions were had he been able to get Deborah Baker into an apartment building. If that's what he's willing to do out on the street inside a parked car, what's he willing to do inside a residence....

This was speculation on the prosecutor's part. Although the state is entitled to argue reasonable inferences based upon the evidence, "mere suspicion or speculation cannot be the basis for creation of logical inferences." *Walters v. Maass*, 45 F.3d 1355, 1358 (9th Cir.1995).

There was no evidence to support the prosecutor's contention that petitioner intended to take Baker inside the building and physically harm her. Baker testified that, as they were driving to the apartment building, petitioner told her that he was going to a friend's house. According to her testimony, he rapped on a window and when no one answered he returned to the car and drove her back to the Pass Club where they had met. On their way back to the Club, petitioner "said he was angry because he had told [Baker] that he was supposed to have picked his friends up." Similarly, according to Officer Taylor's report, Baker told him that when they got to the apartment building petitioner "told her that he had to pick up a guy and girl." Thus, the only available evidence indicates that petitioner went to the building either to pick up some friends or to see a friend. The prosecution presented no evidence that petitioner attempted to enter the building, let alone that he tried to force Baker to enter the building or that he intended to harm her once inside.

■ The state also failed to establish, beyond a reasonable doubt, that petitioner abducted Baker for the specific *purpose* of terrorizing her. To prove specific intent to terrorize there must be evidence of a purpose to do more than that which is necessary to take or confine by force, threat, or deception. *Nulph*, 31 Or.App. at 1165, 572 P.2d 642. Conviction on this charge requires proof of

---

**6.** Baker admits that she voluntarily accompanied petitioner up to the point when they were in the front seat of the parked car. Hence, it is undisputed that the kidnaping charge is premised solely upon events after the alleged rape, when Baker rode in petitioner's car to an apartment building and later to the Pass Club.

an intent "to fill with terror," and is aimed at "vengeful or sadistic abductions." *Id.* The focus is on the defendant's state of mind. *State v. Swaggerty,* 15 Or.App. 343, 347 n. 1, 515 P.2d 952 (1973).[7]

█ A rational trier of fact could not have found, beyond a reasonable doubt, that petitioner drove Baker to the apartment building and the Pass Club for the purpose of terrorizing her. The only hint of such a purpose might come from two remarks petitioner allegedly made while driving, one to the effect that "nobody knew that [Baker] was with him and that he could just take [Baker] away and [they] could be together" and the other to the effect that "he would come down to Minnesota to find [Baker]." Taken out of context, those remarks might seem to be implied threats, but in the context of other remarks petitioner made during the course of the evening it is clear that petitioner was actually suggesting that they run away together or otherwise continue their "relationship." That may have been delusional but it does not equate to specific intent on his part to terrorize Baker. The state also points to a comment petitioner made about Baker being a "tease," but that also falls far short of the mark.

Even if those remarks are viewed as implied threats, they merely go to the question of whether petitioner employed "force, threat or deception" to make Baker accompany him. They do not show that petitioner abducted Baker for the specific *purpose* of terrorizing her. Since no rational juror could have found that the state proved all of the required elements beyond a reasonable doubt, the conviction for first degree kidnaping must be set aside. As such, the denial of petitioner's motion for acquittal and direct appeal on this issue resulted from an unreasonable application of clearly established federal law.

█ In so holding, I decline to modify the state judgment to a conviction for second

degree kidnaping. *See Swaggerty,* 15 Or. App. at 349, 515 P.2d at 955; *Nulph,* 31 Or.App. at 1166, 572 P.2d at 647. It is unclear whether that doctrine is still viable in the aftermath of *State v. Allen,* 301 Or. 35, 717 P.2d 1178 (1986). *See State v. Jefferson,* 81 Or.App. 479, 483, 726 P.2d 392 (court lacked power to modify judgment to second degree kidnaping when trier of fact was never asked to consider that charge), *rev. denied,* 302 Or. 461, 730 P.2d 1251 (1986).[8] The doctrine is based upon Article VII (Amended), § 3, of the Oregon Constitution, which authorizes Oregon appellate courts to modify a judgment if the court "can determine what judgment should have been entered in the court below." However, this court's powers are not derived from the Oregon constitution, and the court is unaware of any comparable provision in federal law. Moreover, because petitioner could avoid conviction on the first degree kidnaping charge if the state failed to prove specific intent to cause physical injury or terrorize, he was free to focus all his efforts on that one weak link and did not need to be concerned with the other elements of the charge.

### CONCLUSION

The petition for writ of habeas corpus (# 1) is GRANTED in part and DENIED in part as follows: GRANTED as to petitioner's kidnaping conviction and DENIED as to petitioner's rape conviction. Petitioner's first degree kidnaping conviction is VACATED.

IT IS FURTHER ORDERED that petitioner's motion for summary judgment (# 8) is DENIED and respondent's motion to deny habeas corpus relief (# 19) is DENIED as to the conviction for first degree kidnaping and GRANTED as to the remaining issues.

---

7. In *Swaggerty,* the abduction took place at knifepoint, and the defendant threatened to kill the victim if she screamed or tried to escape. The Oregon Court of Appeals held that this was insufficient to find, beyond a reasonable doubt, that the victim's terror was the purpose of the kidnaping, as opposed to the means for accomplishing that objective. In *Nulph,* the defendant ultimately murdered the kidnap victim, but that too was held insufficient to sustain a conviction for first degree kidnaping. *Nulph,* 31 Or.App. at 1165, 572 P.2d 642.

8. Here, the jury was never instructed upon or given the option to convict petitioner for second degree kidnaping.